UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 OCT 10  PM 1:00

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA    )
                            )
v.                          )    Case No. 2:22-cr-00111
                            )
LEON DELIMA,                )
                            )
        Defendant.          )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS
AND DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS
COUNT TWO OF THE INDICTMENT**
(Doc. 17)

Pending before the court is Defendant Leon Delima's motion to suppress evidence

and statements seized pursuant to a warrantless stop, search, and arrest on July 2, 2022,

as well as all his statements and evidence discovered as a result. If the court suppresses

the cocaine seized during the July 2, 2022 stop, Mr. Delima moves to dismiss Count Two

of the Indictment, which alleges he knowingly and intentionally possessed with intent to

distribute cocaine.

Mr. Delima filed the pending motions on January 17, 2023 (Doc. 17), and the

government opposed the motions on January 31, 2023. (Doc. 21.) Mr. Delima replied on

July 28, 2023. (Doc. 37.) The court held an evidentiary hearing on August 7, 2023. The

parties filed supplemental memoranda on August 22, 2023. (Docs. 45, 46.) The court held

an evidentiary hearing on September 19, 2023, regarding another motion filed by Mr.

Delima. In response to a discussion with the court that took place on that date, Mr.

Delima filed a supplemental memorandum on September 25, 2023. (Doc. 53.) The

government filed a response on September 28, 2023 (Doc. 54), at which time the court

took the pending motions under advisement.

The government is represented by Assistant United States Attorney Eugenia A.

Cowles. Mr. Delima is represented by Assistant Federal Public Defender Sara M. Puls.

## I.     Findings of Fact.

The court makes the following findings of fact by a preponderance of the evidence.

At approximately 10:12 p.m. on July 2, 2022, a concerned citizen called 911 and reported that he had seen a male discharge a firearm into the air while walking down North Avenue in Burlington, Vermont, near 300 North Avenue. He described the individual as a "young, Black male" wearing "like a wife-beater t-shirt" and "colorful shorts" which he thought were red and black or red and blue. (Government's "Gov't" Ex. 1.) He stated that he had seen the male discharge the firearm and had observed "sparks" coming out of the pistol. *Id.* He advised that he could still see the male, who was walking south on North Avenue and was "by the Shell station now." *Id.* The 911 caller provided his name, date of birth, and the address of his current location at a friend's house.

The Burlington Police Department ("BPD") dispatcher asked officers to respond to the area of 300 North Avenue near the Shell station. The dispatcher advised that a 911 caller had reported that a "young Black male was seen walking north on that street firing a pistol into the air" and further reported that the caller "saw the weapon and a muzzle flash." (Gov't Ex. 2.) The dispatcher stated that the suspect was "wearing a white wife-beater" or "white tank top." *Id.*

After hearing the dispatch, BPD Officer Julian Gonzalez responded to the Shell station. After exiting his police cruiser, he asked an individual in the parking lot and an individual leaving the store whether they had heard gunshots. They replied that they had not heard anything.

When BPD Senior Officer Joseph Congdon heard the dispatch regarding shots fired, he began driving towards the area of 300 North Avenue with his police cruiser's lights activated. North of the Shell station, he saw a pedestrian talking on a cell phone. Officer Congdon slowed his vehicle, rolled down his window, and asked him if he had seen anyone shooting a gun in the area. The pedestrian advised Officer Congdon that "the individual was walking southbound," and Officer Congdon turned his vehicle around and began driving south. (Transcript "Tr." at 51.)

2

BPD Officer John Meierdiercks heard the "shots fired" dispatch over his radio while he was in the BPD's parking lot located at 1 North Avenue. He began driving north on North Avenue towards the Shell station. Within approximately one minute of receiving the dispatch, Officer Meierdiercks radioed that there was a Black male wearing a tank top and walking south near the intersection of North Avenue and Crowley Street. The dispatcher responded that the 911 caller had advised that the male was "wearing colorful shorts[.]" (Gov't Ex. 2.)

Because Officer Meierdiercks was aware that the individual the officers were looking for was a "[y]oung Black male in a white tank top or wife-beater with multicolored shorts" who was "heading northbound[]" on North Avenue in "the area of the Shell station[,]" (Tr. at 20), and because, at the time, there was "very light foot traffic in the area, which [was] typical for that time of night on North Ave.[,]" *id.* at 16, and "[n]o one else fit that description in the area[,]" *id.* at 21, he believed he had seen the suspect notwithstanding the difference in the color of clothing because "it was nighttime, so what could appear to be lighter [colors] could be darker." (Gov't Ex. 3.)

Officer Meierdiercks radioed that the male in the tank top had turned left on to Crowley Street, a dead-end street. After first driving past him, Officer Meierdiercks and his training officer, Corporal Joseph Corrow, turned around on North Avenue and proceeded south. They parked their police cruiser north of Crowley Street and followed the suspect on foot. Another BPD police cruiser with its lights activated turned on to Crowley Street and parked as Officer Meierdiercks turned the corner and observed two males. He shouted at them to stop. This took place approximately one minute and thirty seconds after the report of shots fired.

At least four uniformed officers and one plainclothes officer responded to the scene, including Corporal Corrow and Officers Gonzalez, Congdon, and Meierdiercks. With their weapons drawn, they shouted at the two males to lie down on the ground. Officer Meierdiercks credibly testified that he detained the men at gunpoint and required them to lie on the ground for safety reasons in light of the report of a male recklessly discharging a firearm into the air.

The males complied with the officers' directions and did not attempt to flee or resist. A male wearing a gray short-sleeved shirt with long sweatpants was detained along with the male wearing a blue-and-white patterned tank top and red and blue shorts. After directing the male in the tank top to approach them and to kneel facing away from them, the officers approached the males and handcuffed them both.

Officer Gonzalez patted down the male in the gray shirt for weapons. After allowing him to stand up, Officer Gonzalez asked him his name as well as that of the male in the tank top. He also asked: "What was the deal with the gunshots going off?" (Gov't Ex. 4.) The male provided his name and denied knowing anything about gunshots. He stated that he was friends with the male in the tank top but refused to provide the male's name. Officer Gonzalez replied: "So let me explain why you're being detained, all right? Someone called in saying that people matching your description were shooting off firearms." *Id.* This was not accurate. Approximately two minutes later, the officers uncuffed the male in the gray shirt after determining he was not involved in the incident.

After Officer Congdon handcuffed the male in the tank top, later identified as Mr. Delima, he conducted a "quick cursory[]" pat-down of Mr. Delima's shorts while Mr. Delima remained in a kneeling position. (Tr. at 73.) With this initial pat-down, Officer Congdon did not feel anything that felt like a firearm but he was concerned that a firearm could have been concealed in Mr. Delima's waistband or pockets.

Officer Congdon moved Mr. Delima to the side of his police cruiser and asked whether he had any weapons on him. He informed Mr. Delima that he was being detained because the BPD had received a report of "a male matching your description firing a gun in the area." (Gov't Ex. 6.) As Mr. Delima responded, "No, I got nothing on me," Officer Congdon began feeling the right-hand pocket of Mr. Delima's thin athletic shorts and removing items. (Gov't Ex. 6.) He felt "a large, hard object in his right pocket" and testified that he could not determine whether the object was a weapon without examining it. (Tr. at 74.)[1] He removed several items, including a cell phone in a black case. (Gov't

---

[1] The court finds it unlikely that Officer Congdon reasonably believed a cell phone might be a firearm.

Ex. 6.) Officer Congdon also felt "two plastic bags[,]" one with "a soft powdery substance that was tied off" and one with "a hard, rock-like substance that was tied off[.]" (Tr. at 56.) He credibly testified that he recognized the bags likely contained "drugs on palpation." *Id.* Officer Congdon reached inside the pocket and pulled out the two plastic bags. He said, "Well, that's a problem," and placed the plastic bags on the roof of the vehicle. (Gov't. Ex. 6.) Mr. Delima replied, "All right. My fault. . . . I don't got no guns on me, though." *Id.*

Officer Congdon then felt the left-hand side of Mr. Delima's shorts for two to three seconds before reaching into the pocket and removing other items. One of the items he removed was a cell phone in a camouflage-patterned case. (Tr. at 77-78, Gov't Ex. 6.) While removing items, Officer Congdon asked Mr. Delima whether he had seen anyone shoot or possess a firearm in the area. Mr. Delima denied shooting or possessing a gun and stated he believed that the stop of him was illegal.

After patting down Mr. Delima, Officer Congdon told him that he was being detained because of "multiple reports of a Black male matching your description in the area . . . fir[ing] a gun in the air" and because Officer Congdon "just pulled drugs off [him]." (Gov't Ex. 6.) Mr. Delima again insisted that he did not have a weapon. He stated he no longer wanted to talk and had nothing else to say. When asked for his name, Mr. Delima refused to provide it, stating that the stop was unlawful, that he would not provide his name until taken to the police station, and that he did not want to talk until his lawyer was present.

Officer Congdon reexamined the plastic bags appearing to contain cocaine and confirmed that Mr. Delima did not want to speak with law enforcement. Officer Congdon then told Mr. Delima that he was "under arrest for possession of cocaine and crack." *Id.* Mr. Delima denied that Officer Congdon had removed drugs from his person. *Id.* Officer Congdon then searched Mr. Delima's person before placing him in the vehicle, informing him that "now you are under arrest, so I'm searching you, not patting you down." *Id.* Officer Congdon reached into both of Mr. Delima's shorts pockets, pat down his legs, looked under his shirt, and removed additional items from the left-hand pocket. During

5

this search, Mr. Delima protested there was no reason for the stop and he did not possess a gun.

After moving Mr. Delima into the police cruiser, Officer Congdon placed all items he had removed from Mr. Delima's shorts pockets into a brown paper bag in the trunk of his police cruiser. Neither Officer Congdon nor any other officer read Mr. Delima his *Miranda* rights at any time during the encounter.

BPD Sergeant Vincent Ross arrived on the scene. He retraced Mr. Delima's path on North Avenue and used his flashlight to look for evidence. Approximately half a block north of Crowley Street, a pedestrian pointed out a fanny pack lying several feet from the sidewalk in a driveway next to an apartment building located at 208 North Avenue. He asked the pedestrian whether the bag belonged to him, and the pedestrian advised that it did not. No one else was present. BPD Officer Padric Hartnett joined Sergeant Ross and picked up the fanny pack. Sergeant Ross's body camera footage reveals Officer Hartnett squeezing the bag with his hands without unzipping it. Officer Hartnett returned to Crowley Street with the fanny pack. Both the fanny pack and Mr. Delima's clothing were "BAPE" brand and had a similar camouflage pattern.

Officer Congdon held the fanny pack up to the police cruiser window and asked Mr. Delima, who was seated inside, "This bag right here, is this your bag?" (Gov't Ex. 6.) Mr. Delima denied that the fanny pack was his. Officer Congdon stated, "Okay. So this is abandoned property. Appreciate it, sir. Thank you." *Id.* The officers immediately searched the fanny pack and found approximately \$3,000 in U.S. currency, a sunglasses case, and an empty black soft firearm holster. After the officers saw the holster, Officer Congdon stated, "There's a gun somewhere then . . . We need to do a significant canvass of the street here." *Id.* He credibly testified that "an unaccounted-for firearm in a public space is an inherently dangerous thing." (Tr. at 63.)

Officer Congdon drove Mr. Delima to the police station, where he asked Mr. Delima booking questions, and Mr. Delima provided his name and date of birth. Officer Congdon also asked, "Leon, what's a good phone number for you right now?" (Gov't Ex. 6.) Mr. Delima responded, "I don't have a phone[,]" to which Officer Congdon replied,

6

"You do. I pulled several off you." *Id.* When Mr. Delima stated, "You did not pull several phones off me[,]" Officer Congdon replied, "Then how do I have them in my possession?" *Id.* Mr. Delima responded, "I lost my last phone that I had." *Id.* After Officer Congdon placed Mr. Delima in a holding cell, he created two property receipts for the two cell phones retrieved during the incident.

Upon Mr. Delima's arrest, Officer Gonzalez contacted the 911 caller and requested an in-person follow-up interview, which the caller refused because he had been drinking and was watching a pay-per-view fight. He also refused to come to the BPD station to identify a possible suspect. Officer Gonzalez instead obtained a sworn statement from the 911 caller over the phone. In the sworn statement, the individual stated he had called 911 after hearing "a couple of loud pops" north of 400 North Avenue while he was outside of his friend's house walking the friend's dog. (Defendant's Ex. I at 5.) He heard a male speaking loudly on a cell phone and saw him fire a "small black handgun" into the air multiple times near the bus stop at 375 North Avenue. *Id.* at 13. The 911 caller watched the male cross the street near the Shell station on North Avenue and quickly walk south on the sidewalk. He described the individual as an African-American male in his twenties with "dark" skin, inch-long hair, a tank top, and "colorful" shorts, *id.* at 15-16, but stated that he "couldn't pick him out of the lineup, unless he's wearing exactly the same clothes he was." *Id.* at 17.

Senior Officer Congdon has been a BPD officer since 2018. In October 2021 Officer Meierdiercks was hired as a full-time BPD officer and graduated from the police academy in February 2022. On July 2, 2022, he was completing his field training in a ride-along with a training officer.

## II. Conclusions of Law and Analysis.

Mr. Delima argues that the BPD officers stopped him without reasonable suspicion in violation of the Fourth Amendment. He further contends that the officers' display of force converted any investigatory stop into an unlawful *de facto* arrest unsupported by probable cause. He asserts Officer Congdon's pat down of his shorts exceeded the allowable scope of a constitutional pat-down. He argues that because the

7

officers unlawfully retrieved a cell phone first, they would not have inevitably discovered the cocaine. He seeks suppression of all evidence obtained through the allegedly unlawful searches and seizures as well as suppression of his unwarned statements. If the cocaine is suppressed, Mr. Delima asks that Count Two of the Indictment be dismissed.

## A.    Whether the *Terry* Stop and Pat-Down Were Supported by Reasonable Suspicion.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that, pursuant to the Fourth Amendment, a law enforcement officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).

"Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. The *Terry* investigative stop and frisk is one such exception." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (internal quotation marks and footnote omitted). Because a pat-down is more intrusive than a stop, it requires "a reasonable suspicion not only that criminal activity is afoot, but also that the person suspected is 'armed and dangerous.'" *Id.* at 139 (quoting *Terry*, 392 U.S. at 30).

The Supreme Court has "adopted a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). Under this approach, courts examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 20). "Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

8

For reasonable suspicion to exist, there must be "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing[.]" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (internal quotation marks and citations omitted). "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981).

"Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). In determining whether a reasonable suspicion exists, the court's inquiry is an objective one, and "the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000). The court must consider "the whole picture[,]" *Cortez*, 449 U.S. at 417, and should not view the facts "in isolation from each other[.]" *Arvizu*, 534 U.S. at 274.

Mr. Delima contends that he was seized "before guns were drawn at him[,]" either when Officer Meierdiercks decided to turn around his police cruiser and pursue him or when multiple police cruisers with their emergency lights activated parked near the exit of Crowley Street, a dead-end street. (Doc. 46 at 4.) A person is seized within the meaning of the Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A seizure may occur "by means of physical force or a show of authority," including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 553-54.

9

Mr. Delima was not seized for Fourth Amendment purposes until Officer Meierdiercks commanded Mr. Delima to stop and get down on the ground at gunpoint. *See Terry*, 392 U.S. at 19 n.16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). Prior to this point, Mr. Delima had complete freedom of movement. Although he was on a dead-end street, there were numerous exits available to a person on foot. The subjective intent of Officer Meierdiercks to effect a stop prior to that time period is irrelevant. *See Weaver*, 9 F.4th at 145 ("The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context."). While not every display of a firearm by a police officer results in a seizure, here the officers not only had their weapons drawn but Officer Meierdiercks ordered compliance with his commands and assumed control over Mr. Delima's physical movements. When Mr. Delima submitted to this show of authority, he was not free to leave. As a result, his detention required a reasonable suspicion to support it.

Mr. Delima argues that the officers did not have a reasonable suspicion because the caller's 911 report was not reliable because the caller did not immediately give his address and law enforcement did not verify his identity. He cites *Florida v. J.L.*, 529 U.S. 266 (2000), for the proposition that an anonymous tip to the police that a young Black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun was insufficient to create a reasonable suspicion. There, the court held that the anonymous tip lacked "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop," *id.* at 270 (internal quotation marks omitted), because it "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

This case does not involve an anonymous caller.[2] Instead, the 911 caller identified

---

[2] "Anonymous tips differ from those for which the source is known on two determinative grounds: (1) ability to assess the credibility and reputation for honesty of the tipper and (2) holding the informant accountable for false reporting." *United States v. Freeman*, 735 F.3d 92, 97 (2d Cir. 2013). "Information from a known informant can be assessed for reliability in a way that information from an unknown one simply cannot." *Id.* at 98.

10

himself by name and date of birth, disclosed his present location, and provided a phone number. He agreed that the police could call him later for more information, and they did so. This was "enough information about [him]self to allow [the police] to identify [him] and track [him] down later to hold [him] accountable if [his] tip proved false." *Elmore*, 482 F.3d at 182 (noting woman who called 911 provided "her name, her relationship with the defendant, and two phone numbers at which she could be contacted"). The possibility that "someone could have pretended to be [the individual] and made the call" is simply not "in the same category as the completely anonymous informants in *J.L.* and *White*." *Id.* at 183.

The 911 caller further told the police he had personally observed the suspect firing a handgun into the air. *See United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975) (observing that the Supreme Court and Second Circuit "have recognized personal observation as a reliable basis for an informant's report"). His report of "shots fired" was corroborated by a pedestrian who advised Officer Congdon that the individual who was shooting a gun was headed southbound on North Avenue. Within a matter of minutes, an individual matching the suspect's description was located close to the reported location where the firearm was discharged. Courts have found that "[i]nformation provided by 'an identified bystander with no apparent motive to falsify' has 'a peculiar likelihood of accuracy,' and we have endorsed the proposition that 'an identified citizen informant is presumed to be reliable.'" *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002)); *see also Elmore*, 482 F.3d at 180 (stating that the "veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted"). Although the 911 caller later refused to meet law enforcement in person, this fact was not known to law enforcement at the time of Mr. Delima's detention.

Even if the tip were reliable, Mr. Delima argues that the information available to the officers did not support a reasonable suspicion that he was the individual responsible

11

for discharging the firearm because his appearance and direction of travel[3] did not match the description conveyed by dispatch. He asserts that he was not visibly carrying a firearm nor engaged in suspicious behavior that otherwise might have justified the stop.[4] Mr. Delima further argues that the officers' detention of the male in the gray shirt demonstrates that they were engaged in racial profiling and "acting on a hunch" rather than with reasonable suspicion. (Doc. 46 at 7.)

Consistent with controlling precedent, the court considers the information available to the BPD officers at the moment they seized Mr. Delima. *See Terry*, 392 U.S. at 20 (requiring a *Terry* stop to be "justified at its inception"); *United States v. Patterson*, 25 F.4th 123, 136 (2d Cir. 2022) (considering "whether the information known to officers *at the time of the [defendant's] seizure* . . . gave rise to reasonable suspicion") (emphasis supplied); *Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016) ("We must determine first when [the defendant] was stopped, and hence 'seized' for purposes of the Fourth Amendment, and second whether reasonable suspicion existed at that point."). When the BPD officers stopped Mr. Delima, they knew the suspect was a young Black male wearing a tank top and colorful shorts walking on North Avenue near the Shell station. Mr. Delima's race, gender, clothing, mode of travel, and location fit this description. Traffic, both pedestrian and vehicular, were light at the time, and Mr. Delima was the only person matching that description in sight. Although Mr. Delima's light-patterned tank top was darker than the white tank top the 911 caller described, "a minor

---

[3] Although the 911 caller reported that the male he observed was walking south on North Avenue, the dispatcher advised the officers that the suspect was walking north. A pedestrian, however, told Officer Congdon that the individual was walking south.

[4] Mr. Delima contends that Officer Meierdiercks's testimony that he heard the suspect wore "colorful shorts" before stopping Mr. Delima is not credible. He observes that Officer Meierdiercks did not say "10-4" or otherwise acknowledge the receipt of the "colorful shorts" description. Officer Meierdiercks also did not reference the colorful shorts in the report he wrote on July 3, 2022, or in his State of Vermont deposition on September 13, 2022. His July 3, 2022 report states only that he "observed a [B]lack male matching the description provided by the caller walking south on North Avenue." (Defendant's Ex. J.) The court does not find these minor omissions material because the dispatcher clearly announced that the male suspect was wearing "colorful shorts" and because Officer Meierdiercks could hear that transmission.

discrepancy between a tip and the scene observed by the officers does not by itself invalidate reasonable suspicion." *Lee v. City of Troy*, 520 F. Supp. 3d 191, 213 (N.D.N.Y. 2021); *see also Dancy*, 843 F.3d at 109 (holding that where a victim reported that a suspect was wearing a brown jacket but the defendant was wearing a camouflage jacket, "such a discrepancy does not necessarily defeat a finding of reasonable suspicion"). As Officer Meierdiercks credibly testified, colors can appear different at night.

While Officer Gonzalez's statement to the male in the gray shirt that he was being detained because "people matching your description were shooting off firearms" was inaccurate and perhaps intentionally false,[5] that statement does not materially diminish the accuracy of that same statement when applied to Mr. Delima.

Less than two minutes elapsed between the officers' receipt of the dispatch regarding shots fired and their observation of Mr. Delima. *See Patterson*, 25 F.4th at 138 (finding reasonable suspicion justifying stop when officers spotted car matching description "at the scene of the . . . crime within ten minutes of the first dispatch report"); *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (finding defendant's location "200 feet west of the crime scene, just a few minutes after the reported burglary attempt," supported the officers' reasonable suspicion). As a result, both the temporal and physical proximity of the stop of Mr. Delima closely aligned to the facts known to law enforcement at the time.[6]

---

[5] Mr. Delima does not have standing to challenge the arguably unconstitutional treatment of the male in the gray shirt. *See Alderman v. U.S.*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

[6] *Compare Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) (holding that the description of a "thin, [B]lack male" was too vague and fit too many people in a downtown area with "restaurants, businesses, and nightlife" in a city that was "33.5% African-American"); *United States v. Walker*, 965 F.3d 180, 187 (2d Cir. 2020) (finding "the fact that [the defendant] was walking near the crime scene" did not support a reasonable suspicion because it "was not unusual to seek individuals walking around in the Central Business District" where the defendant was stopped), *with United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) ("Responding to a 911 call at close to 1:00 a.m., the officers spotted [the defendant] walking alone in a high-crime area where no other pedestrians were about" on a route consistent with a suspect fleeing from the crime scene and observing that "the officers had a reasonable suspicion that [the defendant] had been involved in a crime").

A "divide-and-conquer analysis" is impermissible in analyzing reasonable suspicion. *Arvizu*, 534 U.S. at 274. In this case, the totality of the circumstances provided the BPD officers with a reasonable, articulable basis for suspecting that Mr. Delima may have been responsible for the reported gunshots on North Avenue when they ordered him to stop and lie on the ground.

## B. Whether the *Terry* Stop Became an Unlawful *De Facto* Arrest.

When an investigatory seizure or search is initially justified, the inquiry turns to "whether [the officer's action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause." *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case[,]" but "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.*

Mr. Delima asserts that with their weapons drawn, the BPD officers ordered him onto the ground before placing him in handcuffs. He contends this show of force converted his detention into an unlawful *de facto* arrest. An encounter that begins "as a permissible *Terry* stop may . . . ripen[] into an arrest, which must be supported by probable cause, if, for example, the officers unreasonably used means of detention that were more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993); *United States v. Vasquez*, 612 F.2d 1338, 1345 (2d Cir. 1979) ("[A] maximal intrusion, even if technically short of arrest, must be based upon probable cause.").

Whether a stop is "so intrusive as to be tantamount to an arrest" is a "question [that] must be resolved based on the particular facts of [a] case, and the degree of intrusion, the amount of force used, and the extent to which appellant's freedom of

14

movement was curtailed." *United States v. Ceballos*, 654 F.2d 177, 182-83 (2d Cir. 1981) (citation omitted). In making this determination, a court should consider "the need for [any] force" used by law enforcement and "such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used[.]" *Perea*, 986 F.2d at 645 (citations omitted).

In this case, multiple armed and uniformed officers parked near where Mr. Delima was standing and shouted commands at him with their weapons drawn. After complying with the officers' orders, Mr. Delima was immediately handcuffed. These factors weigh in favor of finding a *de facto* arrest. *See Ceballos*, 654 F.2d at 182 (holding that officers blocking the defendant's vehicle, approaching him with guns drawn, and ordering him out of the car constituted arrest); *Patterson*, 25 F.4th at 143 ("We have continued to stress that handcuffing and drawing weapons remain 'hallmark[s] of a formal arrest,' not a *Terry* stop.") (quoting *Bailey*, 743 F.3d at 340). Nonetheless, "a police display of firearms does not invariably denote arrest. . . . Such force can be a reasonable protective measure for an investigatory stop when there is a basis for thinking that suspects are armed and dangerous." *Id.* at 145. Where "the use of force was precipitated by the actions of the detainee[,]" it may be insufficient to transform a *Terry* stop into a formal arrest. *Ceballos*, 654 F.2d at 183 (collecting cases).

Similarly, "even though handcuffs are generally recognized as a hallmark of a formal arrest, not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness[.]" *Bailey*, 743 F.3d at 340 (internal quotation marks omitted). Handcuffing is permissible during an investigatory stop when "police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Id.*[7]

---

[7] *See also United States v. Senna*, 2022 WL 575384, at *7 (D. Vt. Feb. 25, 2022) (finding that "handcuffing was the least intrusive means to ensure officer safety" during a stop of a vehicle with occupants suspected of possessing guns). Handcuffing Mr. Delima was thus "a less

15

Here, the display of force and handcuffing were justified by an objectively reasonable belief that Mr. Delima may have been recklessly shooting a firearm into the air and was presently armed, which, in turn, posed a safety risk to the officers or others. *See Patterson*, 25 F.4th at 140 (considering "the risk of danger presented by the person stopped" in determining the appropriate degree of intrusiveness for an investigatory stop); *id.* at 146 ("Given that the crime under investigation involved the use of a firearm, such an inquiry was necessarily fraught with danger for investigating officers."). It was thus reasonable for the BPD officers to detain Mr. Delima at gunpoint and handcuff him until they had secured the scene and determined that he was not armed. *See id.* at 147 (noting that before officers could frisk or handcuff defendants suspected of possessing guns, they "had to walk from their own vehicles to the [defendants' vehicle], exposing themselves, even if only briefly, to the risk of being shot"). There was no "less forceful, but equally effective, alternative means of protecting [the officers] and bystanders at the initiation of the detention." *Id.* at 146.

Because the BPD officers' "conduct in neutralizing the threat of physical harm was appropriate based on the facts available to the officer[s] at the moment of the seizure[,]" *id.* at 148 (alteration adopted) (internal quotation marks omitted), the display of force and use of physical restraints in detaining Mr. Delima did not convert the investigatory stop into an unlawful *de facto* arrest.

## C. Whether the *Terry* Pat-Down Exceeded the Permissible Scope.

Under *Terry*, "'when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to

---

intimidating—and less dangerous—means of ensuring the safety of everyone on the premises than holding [him] at gunpoint during the search." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (concluding that despite the presence of six officers, defendant's "seizure did not equate to a *de facto* arrest under the Fourth Amendment" where it lasted "only the few minutes it took the officers to locate the sought-for firearm" and occurred at his residence instead of the police station); *see also United States v. Patterson*, 25 F.4th 123, 143 (2d Cir. 2022) (finding handcuffing permissible during an investigatory stop where the circumstances "support[ed] reasonable suspicion to think the menacing assailants were armed and not hesitant to use firearms in their possession").

the officer or to others,' the officer may conduct a pat[-]down search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 24) (alteration adopted). "[A] protective search— permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* (quoting *Terry*, 392 U.S. at 26); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]").

Because the BPD officers had reasonable suspicion to believe Mr. Delima could be armed and dangerous, a *Terry* pat-down for weapons was permissible. *See Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."); *Patterson*, 25 F.4th at 137 (observing that "reasonable suspicion of armed criminal activity . . . strongly support[s] further investigation of persons who might have engaged in such activity and, as a result, might well be armed and dangerous"); *Weaver*, 9 F.4th at 149 ("[T]he only question for Fourth Amendment purposes is whether the officer's basis for thinking that the suspect might be carrying a weapon rises to the level of reasonable suspicion.").

Even if the *Terry* stop and pat-down for weapons were initially constitutional, Mr. Delima argues that Officer Congdon's warrantless search of his shorts pockets exceeded the permissible scope. A protective search becomes unlawful if "the officer continue[s] to squeeze and manipulate the contents of the suspect's pocket after having established that it contain[s] no weapon." *United States v. Rogers*, 129 F.3d 76, 79 (2d Cir. 1997) (citing *Dickerson*, 508 U.S. at 378). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373. If an officer finds contraband while conducting a *Terry* pat-down, a warrantless seizure of it is constitutional unless "the incriminating character of the object [is] not immediately apparent[.]" *Id.* at 379.

After Mr. Delima was asked to stand up, it was permissible for law enforcement to ask him to move toward a police cruiser. *United States v. Gori*, 230 F.3d 44, 56 (2d Cir. 2000) (collecting cases and observing that "it is well established that officers may ask (or force) a suspect to move as part of a lawful *Terry* stop"). There, Officer Congdon continued his pat-down of Mr. Delima's person. Starting with Mr. Delima's right-hand shorts pocket, he removed items including a cell phone in a black case. Turning to the left-hand shorts pocket, he removed items including a cell phone in a camouflage-patterned case. Mr. Delima's two cell phones were not obvious contraband, nor could they reasonably be confused for firearms during the pat-down.[8] Removing the cell phones therefore exceeded the scope of the *Terry* pat-down, as it was not "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29; *see also Sibron v. New York*, 392 U.S. 40, 65 (1968) (explaining protective search approved by *Terry* "consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault").[9]

After removing the first cell phone, when he resumed his pat-down of Mr. Delima's right-hand shorts pocket, as he was entitled to do, Officer Congdon felt what immediately appeared to be contraband in the form of drugs. "If a police officer lawfully

---

[8] The government argues that the hard, flat shape of the cell phone in the right-hand pocket could have been a folding knife or another weapon, or that the cell phone combined with the other materials in the pocket obscured its identity. Officer Congdon did not, however, testify to this effect. He instead merely stated that he needed to examine the cell phone to ensure it was not a weapon. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) ("[T]he outline of a commonly carried object such as a wallet or cell phone does not justify a stop or frisk, nor does feeling such an object during a frisk justify a search.").

[9] *See also United States v. Ponce*, 8 F.3d 989, 999 (5th Cir. 1993) (removal of item officer believed to be folded dollar bills exceeded bounds of *Terry* search and failed to justify seizure of pocket's contents); *United States v. Santillan*, 2013 WL 4017167, at *11 (S.D.N.Y. Aug. 7, 2013) (holding officer's "removal and inspection of wallets, cell phones, and the currency from [suspect's] pocket" was improper where "it was immediately apparent to [the officer] from touch that these items were not weapons"); *Evans v. Solomon*, 681 F. Supp. 2d 233, 247 (E.D.N.Y. 2010) (holding removal of plaintiff's wallet exceeded permissible scope of *Terry* frisk where officer did not allege that the wallet or identification "resembled a weapon").

18

pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] immediately apparent," it is lawful to remove the object. *Id.* at 375.

Officer Congdon credibly testified that when he searched Mr. Delima next to the police cruiser, he could feel two plastic bags of "drugs on palpation." (Tr. at 56.) He removed the two plastic bags, which appeared to contain powder cocaine and cocaine base. *See Dickerson*, 508 U.S. at 375. In these circumstances, the seizure of the cocaine did not exceed the permissible scope of an investigative stop because its unlawful nature was immediately apparent. Thereafter, Officer Congdon resumed his pat-down and obtained the second cell phone.

**D.     Whether Mr. Delima's Cell Phones Would Have Been Inevitably Discovered.**

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.*

A search is "incident to arrest" only if it is "substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Shipley v. California*, 395 U.S. 818, 819 (1969) (quoting *Stoner v. California*, 376 U.S. 483, 486 (1964)) (internal quotation marks omitted). For this reason, "a police officer who makes a lawful arrest may conduct a warrantless search of [only] the arrestee's person and the area 'within his immediate control.'" *Davis v. United States*, 564 U.S. 229, 232 (2011) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

After Officer Congdon lawfully found two plastic bags of what appeared to be cocaine in Mr. Delima's shorts pocket during his *Terry* pat-down, he had probable cause

to arrest Mr. Delima.[10] Approximately three minutes later, Officer Congdon told Mr. Delima he was under arrest. He searched Mr. Delima further before transporting him to the police station. (Gov't Ex. 6.) This was a lawful search incident to arrest that was "substantially contemporaneous" with the discovery of the cocaine and in the "immediate vicinity" of the arrest. *Shipley*, 395 U.S. at 819 (internal quotation marks and citation omitted).

Although the seizure of Mr. Delima's cell phones during a *Terry* pat-down for weapons exceeded the permissible scope, under the "inevitable discovery" doctrine, illegally obtained evidence remains admissible if:

> [t]he means by which the evidence would inevitably be discovered is independent from the means by which the evidence was actually—and unlawfully—discovered. Consistent with this principle, the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in actual discovery was exposed.

*United States v. Lauria*, 70 F.4th 106, 123 (2d Cir. 2023); *see generally Nix v. Williams*, 467 U.S. 431, 448 (1984) ("[W]hen . . . evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.").

A court must find with "a high level of confidence that each of the contingencies required for lawful inevitable discovery of the disputed evidence would in fact have occurred." *Lauria*, 70 F.4th at 123 (quoting *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006)) (internal quotation marks omitted); *accord In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 102 (2d Cir. 2016) ("We have previously characterized the Government's obligation as one of 'certitude' that the evidence would have been discovered.") (quoting *Heath*, 455 F.3d at 58 n.6). "[T]he inevitable discovery doctrine does not apply simply because a reasonable police officer *could have* lawfully discovered

---

[10] The court need not decide whether there was also probable cause to arrest Mr. Delima for reckless discharge of a firearm. Provided there is probable cause to arrest for at least one crime, a search incident to arrest is lawful. *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (concluding that in a lawful arrest "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest").

the evidence at issue; rather, it applies where the record establishes with a sufficiently high degree of certainty that a reasonable police officer *would have* lawfully discovered the evidence[.]" *Lauria*, 70 F.4th at 123 (quoting *Heath*, 455 F.3d at 58) (emphasis in original) (internal quotation marks omitted).

When Officer Congdon conducted a lawful search incident to arrest, he searched both pockets of Mr. Delima's athletic shorts where he had found the cell phones during the pat-down moments earlier. In such circumstances, the cell phones "ultimately or inevitably would have been discovered" in a search incident to arrest. *Nix*, 467 U.S. at 444; *see United States v. Hagood*, 2021 WL 2982026, at *19 (S.D.N.Y. July 15, 2021) (collecting cases and observing that "the inevitable discovery doctrine has frequently held to apply where courts determine that the contraband at issue would have been found in a search incident to a lawful arrest").

For the reasons stated above, Mr. Delima's motion to suppress the cocaine Officer Congdon seized from his person is DENIED. Mr. Delima's motion to suppress the cell phones Officer Congdon seized from his person is also DENIED due to their inevitable discovery during a lawful search incident to arrest.

## E.   Whether Mr. Delima Has Standing to Challenge the Warrantless Search of the Fanny Pack.

Mr. Delima seeks suppression of the fanny pack and its contents on the grounds that the BPD officers searched the fanny pack without a warrant or warrant exception. The government argues that the fanny pack was abandoned property and Mr. Delima lacks standing to challenge a warrantless search of it.

Because "rights assured by the Fourth Amendment are personal rights," when an unreasonable search and seizure occurs, those rights "may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Jones v. United States*, 362 U.S. 257, 260-61 (1960)). A party seeking suppression must establish "(1) that he had an expectation of privacy that society is prepared to consider reasonable and (2) that he had acted in a way with respect to the property in question that indicated a

subjective expectation of privacy." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 181-82 (2d Cir. 2004); *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) (holding that the party seeking suppression bears the "burden of proving not only that the search . . . was illegal, but also that he [or she] had a legitimate expectation of privacy in that [searched property]").

"Abandonment is a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances[.]" *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987). In analyzing whether the fanny pack was abandoned, a court "must focus on the intent of the person who is purported to have abandoned the property[,]" which "may be inferred from words spoken, acts done, and other objective facts." *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (internal quotation marks omitted). "Neither possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others." *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991); *see also United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) ("Ownership of the searched item, though a fact to be considered, is neither in itself sufficient to establish a legitimate expectation of privacy nor a substitute if the requisite legitimate expectation of privacy is lacking.").

Courts have found that an individual does not relinquish his or her expectation of privacy in lost property, unlike abandoned property. *See, e.g., State v. May*, 608 A.2d 772, 775 (Me. 1992) ("Given that defendant did not intentionally discard his wallet but merely lost it, he did not at that time relinquish his expectation of privacy in it and thereby abandon it."); *State v. Ching*, 678 P.2d 1088, 1092 (Haw. 1984) ("Although owners of lost property must expect some intrusion by finders, common sense dictates that they do not forfeit all expectations of privacy in their property as though they had intentionally abandoned it."). Mr. Delima argues that his fanny pack was lost, not abandoned, however, there are no facts to support his contention.[11] The fanny pack was

---

[11] Mr. Delima did not testify nor did he call witnesses to support his post-hearing argument that the fanny pack was lost.

found in a private driveway in a location that made it improbable that it fell from Mr. Delima's body. *Compare May*, 608 A.2d at 775 (determining that "the circumstances of the present case are consistent with defendant's wallet merely falling out of his pocket, with no indication that he had voluntarily discarded it"). It could have been retrieved by any passerby. Mr. Delima was detained at least a half block away from it and expressed no desire to return to the location where it was found. When presented with the opportunity to claim the fanny pack as his lost property, he denied ownership of it.

"Since one forfeits any reasonable expectation of privacy upon abandoning one's property, a warrantless search or seizure of abandoned property does not violate the [F]ourth [A]mendment." *Levasseur*, 816 F.2d at 44; *see also United States v. Caputo*, 808 F.2d 963, 967 (2d Cir. 1987) ("[A]n individual ordinarily retains no expectation of privacy in his own garbage when it has been deposited in the street for collection."); *Hester v. United States*, 265 U.S. 57, 58 (1924) (holding "there was no seizure in the sense of the law when the officers examined the contents of [a jug and bottle] after [they] had been abandoned" when the defendant dropped the jug and threw away the bottle).

In this case, nothing supports a conclusion that Mr. Delima lost the fanny pack or intended to retrieve it at a later time.[12] Because Mr. Delima lacked a reasonable expectation of privacy in a fanny pack he abandoned, he lacks standing to challenge law enforcement's search of it and its seizure of the evidence found therein. His motion to suppress the fanny pack and its contents is therefore DENIED.

## F. Whether Mr. Delima's Unwarned Statements and Their Physical Fruits are Admissible.

The government argues that the public safety exception justified law enforcement

---

[12] *Compare Smith v. Ohio*, 494 U.S. 541, 544 (1990) (holding defendant "clearly has not abandoned [his] property" where he attempted to protect it from officer's inquiry by tossing it onto the hood of his car), *and United States v. Boswell*, 347 A.2d 270, 274 (D.C. 1975) (finding that by placing television in hallway and covering it with a blanket while he went next door to make a phone call, defendant's actions "evidenced an intent, if any, to secrete the television and not to abandon it"), *with United States v. Moffitt*, 2023 WL 4197110, at *4-5 (D. Vt. June 27, 2023) (finding fanny pack was abandoned where defendant placed it "in a stranger's trash can, not knowing whether or when the trash might be picked up and not safeguarding it in any manner[,]" and provided no evidence of intent to retrieve the bag at a later time).

23

officers' questioning of Mr. Delima without *Miranda* warnings. Even if the public safety exception does not apply, the government asserts that the BPD officers' failure to provide *Miranda* warnings before Mr. Delima disclaimed ownership of the fanny pack does not require suppression of the physical fruits of those statements pursuant to *United States v. Patane*, 542 U.S. 630 (2004).

"A person must both be 'in custody' and subject to 'interrogation' for *Miranda* safeguards to apply." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). Mr. Delima was seated in a police cruiser and presumably still handcuffed when he was questioned about the fanny pack. The "restraint[s] on [his] freedom of movement [were thus commensurate with] the degree associated with a formal arrest." *Familetti*, 878 F.3d at 60.

"An interrogation occurs when a suspect 'is subjected to either express questioning or its functional equivalent' and his statements are 'the product of words or actions on the part of the police' that 'were reasonably likely to elicit an incriminating response.'" *Id.* at 57 (quoting *Innis*, 446 U.S. at 300-01). The BPD officers' questioning of Mr. Delima constituted an interrogation for purposes of *Miranda*.

Despite the lack of *Miranda* warnings, the government contends that Officer Congdon's question regarding whether Mr. Delima owned the fanny pack was appropriate under the public safety exception established by *New York v. Quarles*, 467 U.S. 649, 657 (1984). In *Quarles*, the Supreme Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* The Court distinguished "between questions necessary to secure [police officers'] own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 659. Unwarned questioning was permissible under the public safety exception where the police, "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657.

When Officer Congdon questioned Mr. Delima about his ownership of the fanny pack, law enforcement had not yet determined whether Mr. Delima was the individual who had fired the reported gunshots. They had not found a firearm on his person and were still investigating. They had not yet opened the fanny pack and seen the empty firearm holster. Accordingly, questioning Mr. Delima about his ownership of the fanny pack would not safeguard public safety, it would only possibly negate the need for a search warrant before the fanny pack was opened and searched if he disclaimed ownership of it.

Although a close question, by questioning Mr. Delima about his ownership of the fanny pack, the BPD officers lacked a "objectively reasonable need to protect the police or the public from any immediate danger associated with [a possible] weapon." *Id.* at 659 n.8. At that point, any threat posed by Mr. Delima had been neutralized. *Compare United States v. Ferguson*, 702 F.3d 89, 91 (2d Cir. 2012) (finding public safety exception applied where a 911 caller provided name of individual reported to have fired a gun into the air and the police had information from months earlier that the same individual "possessed and had access to firearms"); *United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004) (holding public safety exception applied where mother "recently reported both her son's possession of a firearm in their home and his threats to kill her and her husband"). The public safety exception thus did not justify Officer Congdon's unwarned questioning of Mr. Delima regarding ownership of the fanny pack.

The exclusion of unwarned statements from trial "is a complete and sufficient remedy for any perceived *Miranda* violation." *Patane*, 542 U.S. at 631-32. Because the Fifth Amendment Self-Incrimination Clause "is not implicated by the introduction at trial of physical evidence resulting from voluntary statements," failure to provide *Miranda* warnings does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements." *Id.* at 634.

Mr. Delima's motion to suppress the statements he made when he was seated in the police cruiser and asked about the fanny pack is GRANTED. His motion to suppress the physical fruits of those statements is DENIED.

### G.     Whether to Dismiss Count Two of the Indictment.

Count Two of the Indictment provides: "On or about July 2, 2022, in the District of Vermont, the defendant LEON DELIMA knowingly and intentionally possessed with the intent to distribute cocaine, a Schedule II controlled substance." (Doc. 1 at 2.) Because the cocaine found in Mr. Delima's shorts pocket on July 2, 2022 is not suppressed, his motion to dismiss Count Two is DENIED AS MOOT.

### CONCLUSION

For the foregoing reasons, the court DENIES Mr. Delima's motion to suppress evidence, GRANTS his motion to suppress his statements, and DENIES AS MOOT the motion to dismiss Count Two of the Indictment. (Doc. 17.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _10th_ day of October, 2023.

Christina Reiss, District Judge
United States District Court